IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHELSEY WILEY,

                Plaintiff,

v.

ANDREW SAUL, COMMISSIONER
OF SOCIAL SECURITY

                Defendant.

OPINION AND ORDER

18-cv-835-wmc

---

On December 28, 2017, Administrative Law Judge ("ALJ") Virginia Kuhn concluded that claimant Chelsey Wiley was not disabled within the meaning of the Social Security Act, 42 U.S.C. § 1382c(a)(3)(A), and denied her application for supplemental security income. Wiley now seeks judicial review of this final agency decision under 42 U.S.C. § 405(g). She raises three, basic objections on appeal: (1) the ALJ failed to resolve a conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"); (2) Wiley's mental limitations were not properly incorporated into the ALJ's determination of her residual functional capacity ("RFC"); and (3) the ALJ erred by failing to consider adequately a witness statement submitted by Wiley's mother. (Pl.'s Br. (dkt. #9) 1-2.) The court held oral argument on this case on December 12, 2019, at which counsel for both sides participated telephonically. For the reasons set forth below, the court rejects those objections and will affirm the ALJ's decision.

BACKGROUND[1]

A. **Medical Evidence**

Medical evidence in the record shows that Wiley experienced back pain as early as 2013. (AR at 340.) In September 2013, an MRI also noted annular disc tearing at L4 and L5, the two lowest vertebrae in the lumbar spine, (AR at 384), and in December 2013, Wiley received a lumbar and sacral epidural steroid injection to treat the ongoing pain caused by her back condition (AR at 340). Five months later, in April of 2014, Dr. John Cragg completed a "return to work note" for Wiley, while noting certain restrictions, including no lifting greater than ten pounds, no repetitive gripping, and no reaching above chest levels. (AR at 275.) The next month records include a follow-up treatment note from Dr. Cragg, who observed that Wiley continued to experience chronic low back pain, that she could bend forward ten degrees, and that bending to the right and left produced tenderness. (AR at 384.) Dr. Cragg also noted that Wiley found trigger injections to be helpful, and he determined to proceed with a conservative treatment plan of spinal stabilization exercises. (AR at 384.)

After Wiley fell down a flight of stairs in early 2014, she began to report shoulder pain as well. (AR at 373.) In September 2014, Dr. Cragg saw Wiley for "significant pain" in her shoulder, as well as pain in her neck, such that she could not turn her head. (AR at 373.) Dr. Cragg further noted that she had "[v]ery limited abduction and forward flexion of her shoulder due to voluntary guarding" and referred her for an MRI, which revealed only mild abnormalities. (AR at 373-74, 337-38.) Wiley was again treated by Dr. Cragg

---

[1] These facts are drawn from the Administrative Record ("AR") (dkt. #7).

in November and December of 2014 for both low back and neck pain due to chronic cervical disc syndrome. (AR at 366-67, 367-68.) He wrote that she "is actually quite miserable with pain syndromes," and that she continued to experience pain with forward bending and twisting. (AR at 367.) At that time, Wiley was given trigger injections, which were noted to have worked well in the past, and referred for additional spinal stabilization physical therapy exercises. (AR at 367.)

In January of 2015, Wiley went to the emergency room after feeling a sudden pain in her neck, left shoulder, and arm. (AR at 277.) An MRI revealed mild right shoulder inflammation, but no abnormalities in her cervical spine. (AR at 278.) After approximately three hours in the emergency room, Wiley's symptoms improved and she was discharged in stable condition. (AR at 279.) Later that month, she followed up with Dr. Cragg regarding her neck pain. (AR at 460.) At that time, Cragg observed that her pain was worse with twisting and bending and her cervical spine was tender. (AR at 460.) He also noted that Wiley was neurologically normal, and that she had responded to epidural injections with "good success." (AR at 460.)

In addition, Wiley began treatment for knee pain in February 2015. (AR at 336.) An x-ray showed no evidence of an acute bone abnormality but did reveal a "questionable" small bone cyst. (AR at 336.) A later MRI confirmed that Wiley had a small cyst in her knee joint. (AR at 478.) Wiley was ultimately referred to physical therapy for her knee pain in May 2015. (AR at 480.) In July 2015, the medical records show that Wiley ambulated with an antalgic gait, but that she had full range of motion. (AR at 482.) Later that month, Wiley had a health maintenance exam, in which she reported postprandial

diarrhea, abdominal pain, knee pain, and a previous episode of pain in the right axilliary region that had resolved, but no further concerns. (AR at 485-89.) In November 2016, Wiley also went to the emergency room after feeling lightheaded and nearly lost consciousness while at work. (AR at 516.)

Finally, as for Wiley's mental health conditions, the medical record references an "unspecified mood [affective] disorder"; "bipolar disorder, in partial remission, most recent episode depressed"; and anxiety. (AR at 376-77, 495.) Wiley received prescriptions for these conditions from an advanced practice registered nurse. (AR at 376-77, 495.) Various other treatment notes include impressions of Wiley's mental health condition, but there is no record containing a mental health diagnosis from a licensed medical doctor or psychiatrist.[2]

## B. ALJ Decision

Wiley filed an application for supplemental security income on February 27, 2015, alleging a disability beginning March 18, 2014. (AR at 14.) After her application was denied initially and upon reconsideration, Wiley requested a hearing before an ALJ, which was held on October 19, 2017. (AR at 14.) At the hearing, Wiley was represented by Curtiss Lein, who is also Wiley's counsel on this appeal. (AR at 14.)

Wiley testified that: she experiences extreme pain if she more than "seldom" works

---

[2] In addition to this medical evidence, Wiley's mother submitted a witness letter, dated September 20, 2017, in which she observed that Wiley: "cannot lift over 10 pounds + sometimes not even that," "has to rest or take breaks" when doing household tasks; "has a lot of back pain," which is made worse by "everyday bending"; and has experienced worsening joint and neck pain. (AR at 269-70.) She further noted that medication "helps some but not completely." (AR at 269-70.).

4

from floor to waist (AR at 46); she cannot lift over ten pounds (AR at 41-42); she drops things after repetitive gripping and cannot reach her arms up far (AR at 42, 46, 47); she takes lots of long naps during the day but remains drowsy (AR at 44); she has pain in her muscles and joints, particularly in her lower back and neck (AR a 44); and she falls on uneven surfaces (AR at 45).

After Wiley's testimony, Dr. Andrew Steiner, whom the ALJ had requested to appear as a neutral medical expert, testified. (AR at 53-58, 21.) After reviewing the medical evidence on the record, Dr. Steiner opined that Wiley's conditions did not meet or medically equal any listing in Appendix 1, Subpart P of the regulations, and that she was capable of sedentary work with certain limitations. (AR at 56.) Specifically, he limited Wiley to frequent gripping; occasional bending, kneeling, crawling, and crouching; and no overhead work, balancing, or climbing. (AR at 56-58.)

Cheryl Zilka, a vocational expert, then testified as to the availability of jobs in the national economy for Wiley given her limitations, age, and past relevant work. (AR at 58-X.) The ALJ posed the following hypothetical:

> So we have a younger individual with a high school completed education and past relevant work as a server . . . who is limited to the sedentary exertional range as defined in the regulations and Dictionary of Occupational Titles, frequent fingering, which includes frequent gripping, no overhead work, occasional kneeing, crouching and crawling as well as occasional bending at the waist, no work at unprotected heights or requiring balancing, such as walking on a narrow plank or at heights and no climbing of ladders, ropes or scaffolds.

(AR at 62.) In response, Zilka opined that such an individual could work as a stuffer, cutter/paster, or document preparer, and that sufficient numbers of each of those positions

5

existed in the national economy. (AR at 62-63.) Finally, the ALJ asked whether Zilka's testimony regarding these occupations based on the ALJ's hypothetical was consistent with the DOT, to which Zilka responded in the affirmative, noting that:

> Well, when you [the ALJ] stated occasional bending at the waist, in my opinion that's a little bit different than the way it's described in the DOT and its companions. But I felt the jobs that I cited were consistent with that part of your hypothetical. Also, the overhead reaching is not specifically addressed in the DOT or its companions. The opinion and testimony is based on my 25 years of experience as a licensed, masters level, vocational consultant doing job placement, job site analysis and labor market surveys.

(AR at 63-64.)

On December 28, 2017, the ALJ issued her decision finding Wiley not disabled under the agency's five-step procedure for evaluating disability claims. 20 C.F.R. § 416.920; (AR at 14). More specifically, the ALJ concluded that Wiley suffered from a number of severe physical impairments, but that none met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 17, 19.) The ALJ also noted references in the record to certain mental disorders, but concluded that "the evidence does not establish a medically determinable mental health impairment" because no diagnosis was made by an acceptable medical source. (AR at 17.) She further observed that even if a medically determinable mental impairment was found, the record shows that it is not severe and does not indicate that it limits (or more than mildly limits) her mental functioning. (AR at 17.)

The ALJ next considered Wiley's RFC, writing:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except

> frequent handling and fingering, which includes frequent gripping, no overhead work, occasional kneeling, crouching, and crawling, occasional bending at the waist, no work at unprotected heights or requiring balancing such as walking on a narrow plank or at heights, and no climbing of ladders, ropes or scaffolds.

(AR at 21.) In arriving at this RFC, the ALJ claimed to have considered Wiley's subjective complaints and her mother's letter, which reported functioning consistent with Wiley's testimony. (AR at 21.) In comparing both Wiley's statements and her mother's statements with the objective medical evidence, however, the ALJ found that the statements were "not entirely consistent with [that] evidence and other evidence in the record." (AR at 22.)

Finally, the ALJ considered whether jobs existed in significant numbers in the national economy for Wiley to perform. (AR at 28.) The ALJ wrote that the testimony by Zilka, the vocational expert, concluding that such jobs existed was consistent with the DOT. (AR at 28.) She explained that "there are areas of the residual functional capacity that are not addressed by the DOT such as the occasional bending at the waist and overhead reaching," and that she therefore accepted the vocational expert's "reasonable and persuasive" testimony regarding the jobs that Wiley could perform within the elements of the RFC. (AR at 28.) Based on the testimony of the vocational expert, the ALJ concluded sufficient jobs existed that Wiley was capable of performing and, therefore, found that she was not disabled.

OPINION

On appeal, the court treats the ALJ's findings of fact as "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means

7

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008), and insure that the ALJ has provided "a logical bridge" between findings of fact and conclusions of law, *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

As previously noted, claimant asserts that the ALJ erred by failing to: (1) resolve a conflict between the vocational expert's testimony and the DOT; (2) incorporate Wiley's mental health limitations into her RFC; and (3) adequately consider the statement submitted by Wiley's mother. The court addresses each argument in turn.

## I. Vocational Expert Testimony

The DOT and its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), are resources published by the Department of Labor that list and define occupations in the national economy. *See Donahue v. Barnhart*, 279 F.3d 441, 445 (7th Cir. 2002). The Social Security Administration "rel[ies] primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national

economy." SSR 00-4p. Similarly, vocational experts are used as sources of occupational evidence in certain cases. *Id.*

If there is an apparent conflict between occupational evidence provided by a vocational expert and the DOT, SSR 00-4p instructs that "the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." *Id.* Even so, neither source "automatically 'trumps' when there is a conflict"; instead, "[t]he adjudicator must resolve the conflict by determining if the explanation given by the [vocational expert] is reasonable and provides a basis for relying on the [vocational expert] testimony rather than on the DOT information." *Id.*; *see also Donahue v. Barnhart*, 279 F.3d 441, 445 (7th Cir. 2002) (holding that an ALJ may prefer the testimony of a vocational expert over the conclusions in the DOT, and vice versa). An ALJ has an "affirmative duty" to "inquire into and resolve apparent conflicts" between the DOT and testimony by a vocational expert. *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (citing *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006)).

Here, claimant contends that the testimony by vocational expert Cheryl Zilka that Wiley was capable of performing work as a stuffer, cutter/paster, or document preparer conflicted with the DOT's listings. (Pl.'s Br. (dkt. #9) 28.) The DOT provides that a document preparer job specifically requires frequent fingering and that all three jobs generally require frequent reaching and handling. (*Id.* at 30.) However, according to claimant the ALJ's RFC does not allow for frequent fingering, handling, or reaching. (*Id.*) Claimant's position is, therefore, that Zilka's testimony that Wiley could work as a stuffer,

9

cutter/paster, or document preparer conflicted with the DOT's listings which provide that those three jobs involve tasks which, according to claimant's reading of the RFC, Wiley was unable to perform. (*Id.*)

With respect to the handling and fingering limitations, defendant argues that plaintiff misreads the ALJ's RFC, and that in fact the ALJ concluded that Wiley *could* frequently handle, finger, and grip. (Def.'s Opp'n (dkt. #12) 7.) In fairness to plaintiff, her reading of the ALJ's RFC is understandable. The ALJ wrote: "claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except frequent handling and fingering, which includes frequent gripping . . . ." (AR at 21.) The ALJ's use of the word "except" could be interpreted as a finding that Wiley was *precluded* from engaging in frequent handling and fingering. However, later in the opinion, the ALJ clarified that the RFC involved a "limitation to sedentary work . . . *with* frequent fingering and handling." (AR at 26 (emphasis added).) That the ALJ meant Wiley *could* frequently finger and handle is further supported by the ALJ's reliance on Dr. Steiner's opinion that Wiley "was capable of sedentary work, but continuous gripping would be precluded and could be done frequently." (AR at 22.)

More importantly, in the hypothetical actually posed to the vocational expert, the ALJ stated: "So we have a younger individual . . . who is limited to the sedentary exertional range as defined in the regulations and Dictionary of Occupational Titles, frequent fingering, which includes frequent gripping . . . ." (AR at 62.) Even claimant's counsel conceded at oral argument that this hypothetical suggests that Wiley *could* frequently finger and grip. As these were the limitations given to the vocational expert, her reliance on them,

and her conclusion that jobs that involved frequent fingering and handling were available to Wiley, there was *no* conflict between the vocational expert's opinion and the DOT's occupational listings. Therefore, although the ALJ's phrasing of Wiley's residual functional capacity for handling and fingering as written later in her formal opinion may not have been artful, considering the opinion as a whole *and* the actual hypothetical posed to the vocational expert, the court concludes that there was no conflict between the DOT's listings and the vocational expert's testimony that Wiley was capable of performing jobs that involved frequent handling and fingering.

Claimant also argues that the vocational expert's testimony that Wiley could perform three widely available jobs that, according to the DOT, require frequent reaching is in conflict with the ALJ's RFC. As an initial matter, claimant is correct that the DOT provides that all three jobs involve frequent reaching. *See Dep't of Labor, Dictionary of Occupational Titles*, §§ 731.685-014; 249.587-014; 249.587-018. However, the ALJ did not preclude "reaching" in her RFC; rather, in both her written RFC and in the hypothetical posed to the vocational expert, the ALJ only limited Wiley to no overhead work. (AR at 62.) A limitation on *overhead* work is not synonymous with a limitation on reaching, the latter of which is defined broadly as "[e]xtending hand(s) and arm(s) *in any direction*." *Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, Appendix C. Physical Demands, SCODICOT Appendix C (emphasis added).

Regardless, this distinction between overhead work and reaching was expressly addressed by the vocational expert and the ALJ at the hearing. This began with the ALJ asking the vocational expert generally whether her testimony was consistent with the DOT

11

and also whether, even if not inconsistent, there were elements of her testimony that "might not be addressed or addressed as [the ALJ had] stated them." (AR at 63.) The vocational expert responded that there was no conflict between her testimony and the DOT, and specifically testified that "the overhead reaching [limitation] is not specifically addressed in the DOT or its companions" and that given this lack of DOT guidance, her opinion as to the availability of jobs in these three categories despite a limitation for overhead reaching was "based on my 25 years of experience as a licensed, masters level, vocational consultant doing job placement, job site analysis and labor market surveys." (AR at 63-64.) In the ALJ's written decision, she also acknowledged that her overhead reaching limitation was not addressed in the DOT, but that given the circumstances she accepted the vocational expert's testimony, which was based on twenty-five years of experience, as "reasonable and persuasive." (AR at 28.) Accordingly, the court finds that no conflict existed between the vocational expert's testimony and the DOT, even though the DOT suggests that the three jobs provided by the vocational expert all involved frequent reaching and the RFC precluded overhead work. *See Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) (because DOT does not address the subject of sit-stand options, there was no apparent conflict between DOT and vocational expert's testimony limiting claimant to work that provided opportunity to sit or stand).

Finally, when a vocational expert's testimony merely supplements (rather than conflicts with) the DOT, as is true here, a plaintiff forfeits her opportunity to challenge the vocational expert's testimony by failing to object to the testimony during the administrative hearing itself. *See Brown v. Colvin*, 845 F. 3d 247, 254 (7th Cir. 2016)

("Brown concedes that [the VE's testimony about sit-stand options and allowable time off task] merely supplemented (and did not conflict with) the Dictionary of Occupational Titles (DOT), which means that she forfeited these arguments by failing to object to the testimony during the administrative hearing."). Because claimant did not object to the vocational expert's testimony during the hearing, she has waived the opportunity to challenge this testimony now. Regardless, for all these reasons addressed above, the court finds no conflict between the vocational expert's testimony and the DOT's listings.

## II. Mental Limitations

Claimant next argues that the ALJ failed to incorporate Wiley's mental limitations into the RFC. (Pl.'s Br. (dkt. #9) 31.) Specifically, she argues that an ALJ "must incorporate any functional imitations caused by mental impairments into the claimant's RFC, even if the mental impairments are not severe." (*Id.* at 33 (citing *Kasarksy v. Barnhardt*, 335 F.3d 539, 544 (7th Cir. 2003).) As defendant rightly points out, however, the ALJ did not incorporate mental limitations into the RFC due to the fact that "the record did not establish a medically determinable mental impairment because . . . there was no mental health diagnosis by an acceptable medical source . . . ." (Def.'s Opp'n (dkt. #12) 9.) Indeed, in the ALJ's opinion, she explained just that: although the record "contains a reference to an unspecified mood disorder and a bipolar mood disorder in partial remission," the evidence "does not establish a medically determinable mental health impairment, as no mental health diagnosis has been made by an acceptable medical source as set forth in the regulations." (AR at 17.)

The regulations provide that a claimant's symptoms "will not be found to affect

[her] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b). Further, such an impairment "must be established by objective medical evidence from an acceptable medical source." § 416.921. Finally, under the governing regulations, an "acceptable medical source" does not include an advanced practice registered nurse. SSR 06-03p.

Here, the court did not find, nor did claimant identify, any evidence on the record showing objective medical evidence from an acceptable medical source that demonstrated the presence of any mental impairments. Although the record shows that Wiley was prescribed medications for a mood disorder, bipolar disorder (in partial remission), and anxiety, these prescriptions were written by an advanced practice registered nurse. (AR at 376-77, 495.) Because the record did not establish the existence of a medically determinable mental health impairment by an acceptable medical source, the ALJ plainly did not err by failing to include mental health limitations in the claimant's RFC.[3]

---

[3] In the alternative, defendant argues that even if the court finds a medically determinable mental impairment, the court should reject claimant's appeal because she fails to identify "any evidence in the record that establishes any functional limitations resulting from mental impairments." (Def.'s Opp'n (dkt. #12) 11.) Although no mental limitations were found by the ALJ in her decision, she did write that even if one were found, "this record shows it is not severe with no indication it limits [] or more than mildly limits her ability to understand, remember of apply information, interact with others, concentrate, persist or maintain pace, and adapt or manage oneself." (AR at 17.) The ALJ went on to conduct a thorough review of the evidence showing claimant's normal mood, affect, behavior, judgment, and functioning. (AR at 17-19.) Tellingly, claimant points to no evidence that contradicts the ALJ's assessment of the record. Because claimant has failed to present evidence of *any* limitations caused by Wiley's mental conditions, therefore, it would be pointless to remand even if a medical impairment should have been noted by the ALJ. *See Lemerande v. Berryhill*, No. 17-C-190, 2018 WL 1061462, at *7 (E.D. Wis. Feb. 26, 2018) ("Without any allegations from Lemerande or any medical source that her affective disorder, depression, anxiety, and panic attacks create any limitations or restrictions upon her functional capacity, the ALJ did not err in failing to create limitations of his own."); *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018)

**III. Treatment of Witness Statement**

Finally, claimant argues that the ALJ erred "in totally ignoring various witness statements in the record describing the claimant's limitations." (Pl.'s Br. (dkt. #9) 33.) More specifically, claimant takes issue with the ALJ's treatment of the letter submitted by Wiley's mother, arguing that the ALJ "did not explicitly state why it was not taken into account." (*Id.*)

SSR 06-03p does provide that an ALJ "may" use evidence from non-medical sources, including family members, to "show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p. However, the Seventh Circuit has advised that this ruling "does not *require* the agency to take nonmedical evidence into account; it simply permits it." *Brinley v. Berryhill*, 732 F. App'x 461, 466 (7th Cir. 2018) (citing SSR 06-03p). Here, contrary to claimant's hyperbolic assertions, the ALJ did *not* "totally ignore" the witness statement from Wiley's mother, nor did she fail to state why it was not taken into account. Rather, the ALJ twice referenced the statement, (AR at 21-22), and explained that she did not fully credit it because it was "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision" (AR at 22).

Claimant does not suggest that the statement contained evidence of limitations not discussed by the ALJ. Neither does the record support such an assertion. In particular, the letter from Wiley's mother observed that she "cannot lift over 10 pounds + sometimes

---

(noting that it is plaintiff's burden "to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work").

not even that," "has to rest or take breaks" when doing household tasks, "has a lot of back pain" which is made worse by "everyday bending," and has experienced worsening joint and neck pain. (AR at 269-70.) She further observed that medication "helps some but not completely." (AR at 269-70.) Although the ALJ did not summarize this letter in a separate section of her opinion, she did discuss consistent testimony by Wiley, noting her self-report that she: "cannot lift over ten pounds"; takes lots of naps but remains drowsy; has lower back and neck pain; has muscle and joint pain; and that medication helps "a bit." (AR at 21.) And the ALJ accurately noted that Wiley's mother's statement was consistent with this testimony. An ALJ is not required to separately discuss each piece of evidence on the record, but rather need only sufficiently articulate his or her reasoning to enable an informed review. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Because the ALJ did just that, the court can find no error in her treatment of the witness statement.

ORDER

IT IS ORDERED that the decision of the Commissioner of Social Security denying claimant Chelsey Wiley's application for Supplemental Security Income is AFFIRMED. The clerk of court is directed to enter judgment for the defendant and close this case.

Entered this 13th day of December, 2019.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge